## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRADY NESSLER, Individually and on behalf of all others similarly situated, | ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) | 2:25-cv-02637 |
| v. | ) ) | |
| COINBASE GLOBAL, INC., BRIAN ARMSTRONG, and ALESIA J. HAAS, | ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | ) ) ) | <u>JURY TRIAL DEMANDED</u> |

Plaintiff Brady Nessler ("Plaintiff"), individually and on behalf of all other persons similarly situated, and through Plaintiff's undersigned attorneys, makes and files this complaint against Defendants Coinbase Global, Inc. ("Coinbase" or the "Company"), Brian Armstrong and Alesia J. Hass (collectively, "Defendants"). Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, including, among other things, the investigation conducted by and through her attorneys, which included a review of the Defendants' public documents and announcements made by Defendants, public filings, wire and press releases published by and regarding Coinbase. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### <u>INTRODUCTION</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Coinbase securities between April 14, 2021 and May 14, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants'

violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## THE PARTIES

2.    Plaintiff Brady Nessler, as set forth in the accompanying certification, incorporated by reference herein, purchased Coinbase securities during the Class Period and was economically damaged thereby.

3.    Coinbase has stated the following about its business:

> The Company provides a trusted platform that serves as a compliant gateway to the onchain economy and enables customers to engage in a wide variety of activities, including discovering, trading, staking, storing, spending, earning, and using their crypto assets in both proprietary and third-party product experiences enabled by access to decentralized applications. The Company offers (i) consumers their primary financial account for the cryptoeconomy, (ii) institutions a full-service prime brokerage platform with access to deep pools of liquidity across the crypto marketplace, and (iii) developers a suite of products granting access to the Company's ecosystem.

4.    The Company does not have a principal executive office, as stated below:

> The Company is remote-first and accordingly, does not maintain a headquarters or principal executive office. Substantially all of the Company's executive team meetings are held virtually, with meetings occasionally held in-person at locations that are either not in the Company's offices or in various of the Company's offices distributed around the world. The Company holds all of its stockholder meetings virtually.

5.    Pertinent to this action is CB Payments Ltd. ("CBPL"), a U.K.-based Company subsidiary.  As stated by the United Kingdom's Financial Conduct Authority, "CBPL is part of the Coinbase Group, which operates a prominent cryptoasset trading platform that is accessible globally."  Further, "CBPL does not undertake cryptoasset transactions for customers but it enables customers to deposit fiat currency into e-money wallets which can then be used to purchase and exchange cryptoassets via other entities within the Coinbase Group."

6.     Coinbase's stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "COIN."  On May 12, 2025, it was announced that Coinbase would be joining the Standard and Poor's 500 Index of stocks.

7.     Defendant Brian Armstrong ("Armstrong") served as the Chief Executive Officer ("CEO") and the Chairman of its Board of Directors ("Board") throughout the Class Period.

8.     Defendant Alesia J. Haas ("Haas") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

9.     Defendants Armstrong and Haas are collectively referred to herein as the "Individual Defendants."

10.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

11.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

12.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

13.    Coinbase and the Individual Defendants are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

17.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **SUBSTANTIVE ALLEGATIONS**

18.     On April 14, 2021, before the market opened, the Company filed with the SEC a

prospectus on Form 424B4 (the "Prospectus") in connection with its initial public offering, which

took place that same day.

19.     The Prospectus contained the following statement:

> *We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate, including those governing financial services and banking, trust companies, securities, broker-dealers and ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti- bribery, economic and trade sanctions, **anti-money laundering, and counter-terrorist financing**. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of*

*which may be significant and could adversely affect our business, operating results, and financial condition.*

\*       \*       \*

*Due to our business activities, we are subject to ongoing examinations, oversight, and reviews by U.S. federal and state regulators, including the New York State Department of Financial Services, or NYDFS, **and foreign financial service regulators, including the U.K. Financial Conduct Authority and the Central Bank of Ireland, which each have broad discretion to audit and examine our business**. We are periodically subject to audits and examinations by these regulatory authorities. As a result of findings from these audits and examinations, regulators have, are, and may in the future require us to take certain actions, including amending, updating, or revising our compliance measures from time to time, limiting the kinds of customers which we provide services to, changing, terminating, or delaying the introduction of our existing or new product and services, and undertaking further external audit or being subject to further regulatory scrutiny. We have received, and may in the future receive, examination reports citing violations of rules and regulations, inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, monitoring, training, reporting, and recordkeeping. Implementing appropriate measures to properly remediate these examination findings may require us to incur significant costs, and if we fail to properly remediate any of these examination findings, we could face civil litigation, significant fines, damage awards, forced removal of certain employees including members of our executive team, barring of certain employees from participating in our business in whole or in part, revocation of existing licenses, limitations on existing and new products and services, reputational harm, negative impact to our existing relationships with regulators, exposure to criminal liability, or other regulatory consequences. Further, we believe increasingly strict legal and regulatory requirements and additional regulatory investigations and enforcement, any of which could occur or intensify, may continue to result in changes to our business, as well as increased costs, and supervision and examination for both ourselves and our agents and service providers. Moreover, new laws, regulations, or interpretations may result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying us from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse*

> *effect on our reputation and brand and our business, operating*
> *results, and financial condition.*

(Emphasis added).

20.    The statement in Paragraph 19 was materially false and misleading at the time it was made because it omitted that CBPL had breached a 2020 agreement (the "VREQ" or the "Agreement") with the United Kingdom's Financial Conduct Authority (the "FCA" or the "Authority"), which was designed to improve CBPL's deficient anti-money laundering controls and placed certain requirements on CBPL. The Agreement was reached after the FCA identified material shortcomings in CBPL's processes to prevent criminals or other malicious actors onto its platform. CBPL then breached the Agreement, which resulted in 13,416 high-risk customers being onboarded onto its platform, creating legal exposure.

21.    The Prospectus contained the following statement:

> **Because our long-term success depends, in part, on our ability to**
> **expand our sales to customers outside the United States, our**
> **business is susceptible to risks associated with international**
> **operations.**
>
> **We currently have subsidiaries in the United Kingdom**, *Japan,*
> *Singapore, Brazil, Germany, the Cayman Islands, the Philippines,*
> *and Ireland, as well as the United States. We plan to enter into or*
> *increase our presence in additional markets around the world. We*
> *have a limited operating history outside the United States, and our*
> *ability to manage our business and conduct our operations*
> *internationally requires considerable management attention and*
> *resources and is subject to particular challenges of supporting a*
> *rapidly growing business in an environment of diverse cultures,*
> *languages, customs, tax laws, legal systems, alternate dispute*
> *systems and regulatory systems.* **As we continue to expand our**
> **business and customer base outside the United States, we will be**
> **increasingly susceptible to risks associated with international**
> **operations. These risks and challenges include***:*
>
>                *    *    **
>
> - compliance with  U.S. and foreign laws designed to combat
>   money laundering  and the financing of terrorist activities, as

well as economic and trade sanctions;

(Emphasis added).

22.     The statement set forth in Paragraph 21 was materially false and misleading at the time it was made because, undisclosed to investors, CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and then breached the Agreement designed to address those deficiencies, creating legal exposure.

23.     The Prospectus contained the following risk disclosure:

> ***Our platform may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.***
>
> ***Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and scams****. We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. The use of our platform for illegal or improper purposes could subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us. Moreover, certain activity that may be legal in one jurisdiction may be illegal in another jurisdiction, and certain activities that are at one time legal may in the future be deemed illegal in the same jurisdiction. **As a result, there is significant uncertainty and cost associated with detecting and monitoring transactions for compliance with local laws. In the event that a customer is found responsible for intentionally or inadvertently violating the laws in any jurisdiction, we may be subject to governmental inquiries, enforcement actions, prosecuted, or otherwise held secondarily liable for aiding or facilitating such activities****. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider increased or additional penalties from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of infringing or allegedly infringing items.*

> *Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.*
>
> *        *        *
>
> *While we believe that our risk management and compliance framework is designed to detect significant illicit activities conducted by our potential or existing customers, we cannot ensure that we will be able to detect all illegal activity on our platform. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.*

(Emphasis added).

24.     The statement set forth in Paragraph 23 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

25.     On May 14, 2021, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26.     The 1Q21 Report contained the following risk disclosure:

> ***We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.***
>
> ***Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate**, **including those governing** financial services and banking, trust companies, securities, broker-dealers and alternative*

*trading systems, or ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions,* **anti-money laundering, and counter-terrorist financing.** *Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.*

*   *   *

***Due to our business activities, we are subject to ongoing examinations, oversight, and reviews by*** *U.S. federal and state regulators, including the New York State Department of Financial Services, or NYDFS,* ***and foreign financial service regulators, including the U.K. Financial Conduct Authority and the Central Bank of Ireland, which each have broad discretion to audit and examine our business*** *. We are periodically subject to audits and examinations by these regulatory authorities.* ***As a result of findings from these audits and examinations, regulators have, are, and may in the future require us to take certain actions, including amending, updating, or revising our compliance measures from time to time, limiting the kinds of customers which we provide services to, changing, terminating, or delaying the introduction of our existing or new product and services, and undertaking further external audit or being subject to further regulatory scrutiny*** *. We*

*have received, and may in the future receive, examination reports citing violations of rules and regulations, inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, monitoring, training, reporting, and recordkeeping. Implementing appropriate measures to properly remediate these examination findings may require us to incur significant costs, and if we fail to properly remediate any of these examination findings, we could face civil litigation, significant fines, damage awards, forced removal of certain employees including members of our executive team, barring of certain employees from participating in our business in whole or in part, revocation of existing licenses, limitations on existing and new products and services, reputational harm, negative impact to our existing relationships with regulators, exposure to criminal liability, or other regulatory consequences.* Further, we believe increasingly strict legal and regulatory requirements and additional regulatory investigations and enforcement, any of which could occur or intensify, may continue to result in changes to our business, as well as increased costs, and supervision and examination for both ourselves and our agents and service providers. Moreover, new laws, regulations, or interpretations may result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying us from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse effect on our reputation and brand and our business, operating results, and financial condition.*

(Emphasis added).

27.    The statement set forth in Paragraph 26 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

28.    The 1Q21 Report contained the following risk disclosure, which stated, in pertinent part:

> ***Because our long-term success depends, in part, on our ability to expand our sales to customers outside the United States, our business is susceptible to risks associated with international operations.***
>
> ***We currently have subsidiaries in the United Kingdom***, *Japan, Singapore, Brazil, Canada, Germany, the Cayman Islands, the Philippines, and Ireland, as well as the United States. We plan to enter into or increase our presence in additional markets around the world. We have a limited operating history outside the United States, and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to particular challenges of supporting a rapidly growing business in an environment of diverse cultures, languages, customs, tax laws, legal systems, alternate dispute systems and regulatory systems. **As we continue to expand our business and customer base outside the United States, we will be increasingly susceptible to risks associated with international operations**. These risks and challenges include:*
>
> *    *    *
>
> - ***compliance with U.S. and foreign laws designed to combat money laundering and the financing of terrorist activities***, *as well as economic and trade sanctions;*

(Emphasis added).

29.    The statement set forth in Paragraph 28 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

30.    The 1Q21 Report contained the following risk disclosure:

> ***Our platform may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.***
>
> ***Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and***

*scams*. *We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances.* **The use of our platform for illegal or improper purposes could subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us**. *Moreover, certain activity that may be legal in one jurisdiction may be illegal in another jurisdiction, and certain activities that are at one time legal may in the future be deemed illegal in the same jurisdiction. As a result, there is significant uncertainty and cost associated with detecting and monitoring transactions for compliance with local laws. In the event that a customer is found responsible for intentionally or inadvertently violating the laws in any jurisdiction, we may be subject to governmental inquiries, enforcement actions, prosecuted, or otherwise held secondarily liable for aiding or facilitating such activities. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider increased or additional penalties from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of infringing or allegedly infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.*

*    *    *

**While we believe that our risk management and compliance framework is designed to detect significant illicit activities conducted by our potential or existing customers, we cannot ensure that we will be able to detect all illegal activity on our platform. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.**

(Emphasis added).

31.    The statement set forth in Paragraph 30 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform,

and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

32.    On August 11, 2021, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's  internal control over financial reporting and the disclosure of all fraud.

33.    The 2Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 26 above.

34.    As such, the statement in Paragraph 33 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 27 above.

35.    The 2Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 28 above.

36.    As such, the statement in Paragraph 35 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 29 above.

37.    The 2Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 30 above.

38.    As such, the statement in Paragraph 37 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 31 above.

39.    On November 10, 2021, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2021 (the "3Q21 Report").  Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

40.    The 3Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 26 above.

41.    As such, the statement in Paragraph 40 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 27 above.

42.    The 3Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 28 above.

43.    As such, the statement in Paragraph 42 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 29 above.

44.    The 3Q21 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 30 above.

45.    As such, the statement in Paragraph 40 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 31 above.

46.    On February 25, 2022, Coinbase filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

47.    The 2021 Annual Report contained the following statement:

> **We serve our customers through Electronic Money Institutions authorized by the U.K. Financial Conduct Authority** and the Central Bank of Ireland. **We comply with rules and regulations applicable to the European e-money industry**, including those related to funds safeguarding, corporate governance, **anti-money laundering**, disclosure, reporting, and inspection. We are, or may

> *be, subject to banking-related regulations in other countries now or*
> *in the future related to our role in the financial industry.*

(Emphasis added).

48.    The statement in Paragraph 47 was materially false and misleading at the time it was made because the Company did not in fact "comply" with its legal obligation in the United Kingdom as it related to anti-money laundering efforts, because it had breached the Agreement.

49.    The 2021 Annual Report contained the following risk disclosure:

> ***We are subject to an extensive and highly-evolving regulatory***
> ***landscape and any adverse changes to, or our failure to comply***
> ***with, any laws and regulations could adversely affect our brand,***
> ***reputation, business, operating results, and financial condition.***
>
> ***Our business is subject to extensive laws, rules, regulations,***
> ***policies, orders, determinations, directives, treaties, and legal and***
> ***regulatory interpretations and guidance in the markets in which***
> ***we operate****, including those governing financial services and*
> *banking, federal government contractors, trust companies,*
> *securities, broker-dealers and alternative trading systems, or ATS,*
> *commodities, credit, crypto asset custody, exchange, and transfer,*
> *cross-border and domestic money and crypto asset transmission,*
> *retail and commercial lending, usury, foreign currency exchange,*
> *privacy, data governance, data protection, cybersecurity, fraud*
> *detection, payment services (including payment processing and*
> *settlement services), retail protection, escheatment, antitrust and*
> *competition, bankruptcy, tax, anti-bribery, economic and trade*
> *sanctions,* ***anti-money laundering, and counter-terrorist***
> ***financing****. Many of these legal and regulatory regimes were*
> *adopted prior to the advent of the internet, mobile technologies,*
> *crypto assets, and related technologies. As a result, some applicable*
> *laws and regulations do not contemplate or address unique issues*
> *associated with the cryptoeconomy, are subject to significant*
> *uncertainty, and vary widely across U.S. federal, state, and local*
> *and international jurisdictions. These legal and regulatory regimes,*
> *including the laws, rules, and regulations thereunder, evolve*
> *frequently and may be modified, interpreted, and applied in an*
> *inconsistent manner from one jurisdiction to another, and may*
> *conflict with one another. Moreover, the complexity and evolving*
> *nature of our business and the significant uncertainty surrounding*
> *the regulation of the cryptoeconomy requires us to exercise our*
> *judgment as to whether certain laws, rules, and regulations apply to*
> *us, and it is possible that governmental bodies and regulators may*

*disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.*

*       *       *

***Due to our business activities, we are subject to ongoing examinations, oversight, and reviews and currently are, and expect in the future, to be subject to investigations and inquiries,*** *by U.S. federal and state regulators, including the NYDFS,* ***and foreign financial service regulators, including the U.K. Financial Conduct Authority*** *and the Central Bank of Ireland, which each have broad discretion to audit and examine our business. We are periodically subject to audits and examinations by these regulatory authorities. As a result of findings from these audits and examinations, regulators have, are, and may in the future require us to take certain actions, including amending, updating, or revising our compliance measures from time to time, limiting the kinds of customers that we provide services to, changing, terminating, or delaying our licenses and the introduction of our existing or new product and services, and undertaking further external audit or being subject to further regulatory scrutiny, including investigations and inquiries.* ***We have received, and may in the future receive, examination reports citing violations of rules and regulations, inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, monitoring, training, reporting, and recordkeeping. Implementing appropriate measures to properly remediate these examination findings may require us to incur significant costs, and if we fail to properly remediate any of these examination findings, we could face civil litigation, significant fines, damage awards, forced removal of certain employees including members of our executive team, barring of certain employees from participating in our business in whole or in part, revocation of existing licenses, limitations on existing and new products and services, reputational harm, negative impact to our existing relationships with regulators, exposure to criminal liability, or other regulatory consequences****. Further, we believe increasingly strict legal and regulatory requirements and additional regulatory investigations and enforcement, any of which could occur or intensify, may continue to result in changes to our business, as well as increased costs, and supervision and examination for ourselves, our agents, and service providers. Moreover, new laws, regulations, or interpretations may*

> *result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying us from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse effect on our reputation and brand and our business, operating results, and financial condition.*

(Emphasis added).

50.    The statement in Paragraph 49 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

51.    The 2021 Annual Report contained the following risk disclosure:

> **Because our long-term success depends, in part, on our ability to expand our sales to customers outside the United States, our business is susceptible to risks associated with international operations.**
>
> **We currently have subsidiaries in the United Kingdom**, *Japan, Singapore, Brazil, Canada, Germany, the Cayman Islands, the Philippines, Ireland, India, Kenya, Israel, and Australia, as well as the United States. We plan to enter into or increase our presence in additional markets around the world. We have a limited operating history outside the United States, and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to particular challenges of supporting a rapidly growing business in an environment of diverse cultures, languages, customs, tax laws, legal systems, alternate dispute systems, and regulatory systems. **As we continue to expand our business and customer base outside the United States, we will be increasingly susceptible to risks associated with international operations**. These risks and challenges include:*
>
> *    *    *
>
> - **Compliance with U.S. and foreign laws designed to combat**

> ***money laundering and the financing of terrorist activities, a***s
> well as economic and trade sanctions;

(Emphasis added).

52.     The statement in Paragraph 51 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

53.     The 2021 Annual Report contained the following risk disclosure:

> ***Our platform may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.***
>
> ***Our platform may be exploited to facilitate illegal activity*** *including fraud,* ***money laundering,*** *gambling, tax evasion, and scams. We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers,* ***and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances****. The use of our platform for illegal or improper purposes could subject us to claims, individual and class action lawsuits,* ***and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us****. Moreover, certain activities that may be legal in one jurisdiction may be illegal in another jurisdiction, and certain activities that are at one time legal may in the future be deemed illegal in the same jurisdiction. As a result, there is significant uncertainty and cost associated with detecting and monitoring transactions for compliance with local laws. In the event that a customer is found responsible for intentionally or inadvertently violating the laws in any jurisdiction, we may be subject to governmental inquiries, enforcement actions, prosecuted, or otherwise held secondarily liable for aiding or facilitating such activities. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider increased or additional penalties from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of*

> *infringing or allegedly infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.*
>
> *   *   *
>
> ***While we believe that our risk management and compliance framework is designed to detect significant illicit activities conducted by our potential or existing customers, we cannot ensure that we will be able to detect all illegal activity on our platform****. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.*

(Emphasis added).

54.     The statement in Paragraph 53 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

55.     On May 10, 2022, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

56.     The 1Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 49 above.

57.     As such, the statement in Paragraph 56 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 50 above.

58.     The 1Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 51 above.

59.    As such, the statement in Paragraph 58 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 52 above.

60.    The 1Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 53 above.

61.    As such, the statement in Paragraph 60 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 54 above.

62.    On August 9, 2022, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2022 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

63.    The 2Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 49 above.

64.    As such, the statement in Paragraph 63 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 50 above.

65.    The 2Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 51 above.

66.    As such, the statement in Paragraph 65 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 52 above.

67.    The 2Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 53 above.

68.    As such, the statement in Paragraph 67 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 54 above.

69.     On November 3, 2022, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

70.     The 3Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 49 above.

71.     As such, the statement in Paragraph 70 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 50 above.

72.     The 3Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 51 above.

73.     As such, the statement in Paragraph 72 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 52 above.

74.     The 3Q22 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 53.

75.     As such, the statement in Paragraph 74 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 54 above.

76.     On February 21, 2023, Coinbase filed with the SEC its annual report on Form  10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.     The 2022 Annual Report contained the following statement:

> *We serve our customers through **Electronic Money Institutions authorized by the U.K. Financial Conduct Authority** and the Central Bank of Ireland. **We comply with rules and regulations** applicable to the European e-money industry, including those related to funds safeguarding, corporate governance, **anti-money laundering**, disclosure, reporting, and inspection. We are, or may be, subject to banking-related regulations in other countries now or in the future related to our role in the financial industry.*

(Emphasis added).

78.    The statement in Paragraph 77 was materially false and misleading at the time it was made because the Company did not in fact "comply" with its legal obligation in the United Kingdom as it related to anti-money laundering efforts, because it had breached the Agreement.

79.    The 2022 Annual Report contained the following risk disclosure:

> *We are subject to an extensive, highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.*
>
> *Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate, including those governing financial services and banking, federal government contractors, trust companies, securities, derivative transactions and markets, broker-dealers and alternative trading systems ("ATS"), commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, **anti-money laundering, and counter-terrorist financing**. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes,*

*including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgment as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.*

*        *        *

***Due to our business activities, we are subject to ongoing examinations, oversight, and reviews and currently are, and expect in the future, to be subject to investigations and inquiries, by U.S. federal and state regulators and foreign financial service regulators,*** *many of which have broad discretion to audit and examine our business. We are periodically subject to audits and examinations by these regulatory authorities. As a result of findings from these audits and examinations, regulators have, are, and may in the future require us to take certain actions, including amending, updating, or revising our compliance measures from time to time, limiting the kinds of customers that we provide services to, changing, terminating, or delaying our licenses and the introduction of our existing or new product and services, and undertaking further external audit or being subject to further regulatory scrutiny, including investigations and inquiries.* ***We have received, and may in the future receive, examination reports citing violations of rules and regulations, inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, monitoring, training, reporting, and recordkeeping****. Implementing appropriate measures to properly remediate these examination findings may require us to incur significant costs, and if we fail to properly remediate any of these examination findings, we could face civil litigation, significant fines, damage awards, forced removal of certain employees including members of our executive team, barring of certain employees from participating in our business in whole or in part, revocation of existing licenses, limitations on existing and new products and services, reputational harm, negative impact to our existing relationships with regulators, exposure to criminal liability, or other regulatory consequences. For example,*

> *in January 2023, we settled a New York Department of Financial Services ("NYDFS") compliance investigation for a monetary penalty of $50 million and a separate commitment to make $50 million in compliance program investments by the end of 2024. Further, we believe increasingly strict legal and regulatory requirements and additional regulatory investigations and enforcement, any of which could occur or intensify, may continue to result in changes to our business, as well as increased costs, and supervision and examination for ourselves, our agents, and service providers. Moreover, new laws, regulations, or interpretations may result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying us from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse effect on our reputation and brand and our business, operating results, and financial condition.*

(Emphasis added).

80.    The statement in Paragraph 79 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

81.    The 2022 Annual Report contained the following risk disclosure:

> **Because our long-term success depends, in part, on our ability to expand our sales to customers outside the United States, our business is susceptible to risks associated with international operations.**

> **We currently have subsidiaries in the United States and abroad.** *We plan to enter into or increase our presence in additional markets around the world. We have a limited operating history outside the United States, and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to particular challenges of supporting a growing business in an environment of diverse cultures, languages, customs, tax laws, legal systems, alternate dispute systems, and regulatory systems. As we continue to expand*

> *our business and customer base outside the United States, we will be increasingly susceptible to risks associated with international operations*. These risks and challenges include:
>
>          \*         \*         \*
>
> - *compliance with U.S. and foreign laws designed to combat money laundering and the financing of terrorist activities*, as well as economic and trade sanctions;

(Emphasis added).

82.     The statement in Paragraph 81 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

83.     The 2022 Annual Report contained the following risk disclosure:

> *Our platform may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.*
>
> *Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and scams*. We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. *The use of our platform for illegal or improper purposes could subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us*. Moreover, certain activities that may be legal in one jurisdiction may be illegal in another jurisdiction, and certain activities that are at one time legal may in the future be deemed illegal in the same jurisdiction. As a result, there is significant uncertainty and cost associated with detecting and monitoring transactions for compliance with local laws. In the event that a customer is found responsible for intentionally or inadvertently violating the laws in any jurisdiction, we may be subject to governmental inquiries, enforcement actions,

*prosecuted, or otherwise held secondarily liable for aiding or facilitating such activities. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider increased or additional penalties from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of infringing or allegedly infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.*

*   *   *

***While we believe that our risk management and compliance framework is designed to detect significant illicit activities conducted by our potential or existing customers, we cannot ensure that we will be able to detect all illegal activity on our platform****. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.*

(Emphasis added).

84.     The statement in Paragraph 83 was materially false and misleading at the time it was made because it omitted that CBPL had been found by the FCA to have inadequate anti-money laundering focused systems to prevent high-risk individuals from using its platform, and that CBPL then breached the Agreement designed to address those deficiencies, creating legal exposure.

85.     On May 4, 2023, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

86.     The 1Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 79 above.

87.     As such, the statement in Paragraph 86 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 80.

88.     The 1Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 81 above.

89.     As such, the statement in Paragraph 88 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 82 above.

90.     The 1Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 83 above.

91.     As such, the statement in Paragraph 90 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 84 above.

92.     On August 3, 2023, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2023 (the "2Q23 Report"). Attached to the 2Q23 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

93.     The 2Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 79 above.

94.     As such, the statement in Paragraph 93 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 80 above.

95.     The 2Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 81.

96.     As such, the statement in Paragraph 95 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 82 above.

97.     The 2Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 83 above.

98.     As such, the statement in Paragraph 97 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 84 above.

99.     On November 2, 2023, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2023 (the "3Q23 Report"). Attached to the 3Q23 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

100.    The 3Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 79 above.

101.    As such, the statement in Paragraph 100 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 80 above.

102.    The 3Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 81 above.

103.    As such, the statement in Paragraph 102 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 82 above.

104.    The 3Q23 Report contained a substantially similar risk disclosure to the one discussed in Paragraph 83 above.

105.    As such, the statement in Paragraph 104 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 84 above.

106.    On February 13, 2025, Coinbase caused its annual report on Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report") to be filed with the Securities and Exchange Commission.

107.    The 2024 Annual Report contained a substantially similar risk disclosure to the one discussed in Paragraph 81 above.

108.    As such, the statement in Paragraph 107 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 82 above.

109.    The 2024 Annual Report contained a substantially similar risk disclosure to the one discussed in Paragraph 83 above.

110.    As such, the statement in Paragraph 109 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 84 above.

111.    On May 8, 2025, Coinbase filed with the SEC its quarterly report on Form 10-Q for the period ending March 30, 2025 (the "1Q25 Report").  Attached to the 1Q25 Report were certifications pursuant to SOX signed by Defendants Armstrong and Haas attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

112.    The 1Q25 Report contained risk disclosures substantially similar to the one discussed in Paragraph 79 above.

113.    As such, the statement in Paragraph 112 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 80 above.

114.    The 1Q25 Report contained risk disclosures substantially similar to the one discussed in Paragraph 81 above.

115.    As such, the statement in Paragraph 114 was materially false and misleading at the time it was made due to the reasons discussed in Paragraph 82 above.

116.    The statements, or lack thereof, contained in Paragraphs 19, 21, 23, 26, 28, 30, 33, 35, 37, 40, 42, 44, 47, 49, 51, 53, 56, 58, 60, 63, 65, 67, 70, 72, 74, 77, 79, 81, 83, 86, 88, 90, 93, 95, 97, 100, 102, 104, 107, 109, 112 and 114 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) In 2020, after investigation, the United Kingdom's FCA had deemed efforts by the Company's British unit, the CBPL, to prevent criminals from using its platform, to be inadequate; (2) as a result, the FCA reached an agreement with CBPL, which put requirements in place that were designed to prevent high risk customers from using CBPL's platform; (3) CBPL then breached that agreement, which resulted in 13,416 high risk individuals receiving services; (4) the foregoing resulted in an undisclosed heightened regulatory risk; (5) Coinbase had been hacked and its accounts compromised; (6) the SEC was investigating Coinbase for its account problems; and (7) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

117.    On July 25, 2024, the Financial Conduct Authority (the "FCA" or the "Authority"), the United Kingdom's financial regulator, published a press release entitled "FCA takes first enforcement action against firm enabling cryptoasset trading" (the "FCA Announcement"). The FCA Announcement then stated that "CB Payments Limited (CBPL) has been fined £3,503,546

by the Financial Conduct Authority (FCA) *for repeatedly breaching a requirement that prevented the firm from offering services to high-risk customers*." (Emphasis added).

118.    The FCA Announcement then stated the following about CB Payments Limited ("CBPL"):

> **CBPL is part of the Coinbase Group, which operates a prominent cryptoasset trading platform that is accessible globally. CBPL does not undertake cryptoasset transactions for customers but it acts as a gateway for customers to trade cryptoassets via other entities within the Coinbase Group**. *CBPL is not currently registered to undertake cryptoasset activities in the UK.*

(Emphasis added).

119.    The FCA Announcement revealed that CBPL had "into a voluntary requirement (the VREQ) in October 2020, **which followed significant engagement with the FCA relating to concerns about the effectiveness of CBPL's financial crime control framework**.   The VREQ prevented CBPL from taking on new high-risk customers while it addressed issues with its framework." (Emphasis added).

120.    The FCA Announcement then revealed that CBPL had repeatedly breached its October 2020 agreement with the FCA (the "VREQ" or the "Agreement"). It stated the following:

> **Despite the restrictions in place, CBPL onboarded and/or provided e-money services to 13,416 high-risk customers**. *Approximately 31 per cent of these customers deposited around USD $24.9 million.* **These funds were used to make withdrawals and then execute multiple cryptoasset transactions via other Coinbase Group entities, totaling approximately USD $226 million.**

(Emphasis added).

121.    The FCA Announcement stated the following about CBPL's breaches of the Agreement:

> **The breaches were the result of CBPL's lack of due skill, care and diligence in the design, testing, implementation and monitoring of the controls put in place to ensure that the VREQ was effective**.

> *This included failing to consider all of the various ways in which customers might be onboarded when designing the controls.* ***Because of inadequacies in the initial monitoring of compliance with the VREQ, repeated and material breaches went undiscovered for almost two years***.

(Emphasis added).

122.    The FCA Announcement quoted Therese Chambers, joint executive Director of

Enforcement and Market Oversight at the FCA as stating the following:

> ***The money laundering risks associated with crypto are obvious and firms must take them seriously***. *Firms like CBPL that enable crypto trading need to have strong financial crime controls.* ***CBPL's controls had significant weaknesses and the FCA told it so, which is why the requirements were needed. CPBL, however, repeatedly breached those requirements.***
>
> ***This increased the risk that criminals could use CBPL to launder the proceeds of crime***. *We will not tolerate such laxity, which jeopardises the integrity of our markets.'*

(Emphasis added).

123.    Attached to the Announcement was a Final Notice, dated July 23, 2024, which

detailed the reasons for why the FCA fined CBPL (the "Final Notice").

124.    The Final Notice stated the following about CBPL:

> *CBPL is an Authorized Electronic Money Institution ("AEMI"), with permission to issue electronic money ("e-money") and to provide payment services. It is part of the Coinbase Group, which operates a prominent cryptoasset trading platform that is accessible globally.* ***CBPL does not undertake cryptoasset transactions for customers but it enables customers to deposit fiat currency into e-money wallets which can then be used to purchase and exchange cryptoassets via other entities within the Coinbase Group***.

(Emphasis added).

125.    The Final Notice stated the following about cryptoassets, as background:

> *Cryptoassets provide a near-instant and low-cost way to transfer value across borders. Whilst the vast majority of cryptoasset transfers are conducted for valid purposes, they* ***can be an attractive***

> *technological enabler for criminals seeking to launder funds. This is due to a number of **factors including the pseudo-anonymous nature of cryptoassets and services, their accessibility online, and constant innovation offering new opportunities for criminals to exploit novel applications**.*

(Emphasis added).

126.    The Final Notice stated the following about the importance of combating money laundering:

> *Combating the laundering of funds through the financial services sector is an issue of international importance, and forms part of the Authority's operational objective of protecting and enhancing the integrity of the UK financial system. Authorised firms are at risk of being abused by those seeking to launder money and firms that conduct payment services and/or those seeking to launder money and firms that conduct payment services and/or those which facilitate trading in cryptoassets may be at particular risk. As a result, it is imperative that such firms maintain robust systems and controls to identify and mitigate the risk of their businesses being used in this way.*

(Emphasis added).

127.    The Final Notice stated the following about CBPL's legal obligations as a financial institution:

> *As a financial institution, **CBPL is required to identify and assess the risks of money laundering and terrorist financing to which its business is subject and to maintain controls to mitigate and manage effectively these risks.** This includes compliance with the requirements of the MLR 2017 ["The Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017"]. The Authority is responsible for supervising CBPL and taking necessary measures to secure its compliance with these requirements.*

(Emphasis added).

128.    The Final Notice stated the following about its initial findings into CBPL's financial crime control framework:

> *During a visit to CBPL in February 2020, the Authority identified significant weaknesses and gaps in the Firm's financial crime control framework. **The Authority considered that the weaknesses meant that CBPL's business should be restricted to prevent high-risk customers accessing its e-money and payment services while the Firm remediated its financial crime controls**.*

(Emphasis added).

129.    The Final Notice further stated:

> *The Firm was the subject of a financial crime controls assessment visit on 27 and 28 February 2020. Following the visit, on 30 April 2020, the Authority issued a feedback letter, which concluded that significant weaknesses and gaps persisted in CBPL's financial crime control framework. **The Authority noted that this was particularly concerning given the high-risk nature of CBPL's business and that limited progress appeared to have been made to address issues highlighted in audits performed by the Firm since 2018. In particular, a sample of reviewed files showed limited evidence of risk assessments having been performed in certain high risk situations**.*

(Emphasis added).

130.    The Final Notice stated that, after the FCA's February 2020 findings, the FCA and CBPL worked together to agree on what a "high-risk" customer is, with the goal of preventing high-risk customers from using the Company's platform. Specifically, the Final Notice stated the following:

> *In the following months [after the February 2020 findings of "significant weaknesses and gaps" in CBPL's financial crime control framework], the Authority engaged with CBPL **to agree [on] a definition of "high-risk" which would enable CBPL's automated onboarding systems to prevent such customers being onboarded**. On 30 October 2020, on CBPL's application, **the Authority imposed on CBPL requirements which prevented such customers from being onboarded or provided with payment or e-money services ("the CBPL VREQ"). These were mandatory regulatory requirements, with which CBPL was required to comply**.*

(Emphasis added).

131.    The Final Notice stated that the terms of the VREQ were as follows:

*Under the CBPL VREQ, the Firm was required not to onboard, provide payment services or issue e-money to: new institutional or corporate customers identified as 'high-risk' or 'ineligible' as per the Firm's institutional customer risk rating methodology; and new retail or personal customers that met any one of a number of specific criteria.*

*(*Emphasis added).

132.    Despite the VREQ, the Final Notice stated the following:

Between 31 October 2020 and 1 October 2023 (the "Relevant Period") CBPL onboarded approximately 3.9 million customers. During this time CBPL repeatedly breached the requirements imposed on it by the CBPL VREQ by:

a) **onboarding and/or providing payment or e-money services to 13,416 separate high- risk customers, as defined by the CBPL VREQ**, with some of these customers being provided payment or e-money services on multiple occasions; and

b) permitting approximately 31% of these customers **to make 12,912 prohibited deposits with a total value of approximately USD $24.9 million; these monies were then used to make withdrawals and, thereafter, execute multiple cryptoasset transactions via other Coinbase Group entities using the same funds**, totalling approximately USD $226 million.

(Emphasis added).

133.    The Final Notice stated the following on what caused CBPL's breaches of the

VREQ:

*The breaches of the CBPL VREQ were caused by a failure on the part of CBPL, between 30 October 2020 and 14 April 2023, in breach of Principle 2 of the Authority's Principles for Businesses (the "Principles"), to exercise due skill, care and diligence in relation to the design, testing, implementation and monitoring of the controls put in place to ensure compliance with it, including an automated 'flag' placed on relevant customers' accounts ("the VREQ Flag"). In particular:*

a) ***CBPL failed to maintain adequate records*** *regarding the steps it took to ensure compliance with the CBPL VREQ;*

*b) CBPL failed to ensure that the engineers tasked with updating the automated onboarding process were provided with complete instructions, including the most recent version of the CBPL VREQ, meaning that, when originally implemented, the controls failed to give full effect to the CBPL VREQ;*

*c) CBPL's pre-implementation **testing of the VREQ Flag was inadequate;***

*d) CBPL **failed to adequately consider all of the various products and systems through which customers could access e-money services** when designing and implementing the VREQ Flag;*

*e) CBPL failed to ensure that when certain new systems enabling customers to execute transactions were introduced, effective controls were introduced to ensure that the new systems did not undermine CBPL's compliance with the terms of the CBPL VREQ;*

*f) CBPL failed to adequately consider all of the various ways in which customers might be onboarded when designing and implementing the VREQ Flag, **in particular the position of customers migrating from other Coinbase Group entities and, crucially, whether an assessment was conducted at that time to ensure that any high-risk customers seeking to onboard were subject to the VREQ Flag;***

*g) The initial monitoring of compliance with the CBPL VREQ, conducted by the Product, Engineering and Design team ("PED") within the Coinbase Group, was inadequate; this meant that repeated and material breaches of the CBPL VREQ went undiscovered for almost 2 years; and*

*h) Notwithstanding CBPL identifying breaches of the VREQ shortly after it came into effect, CBPL failed to conduct a formal review of the overall effectiveness of the controls intended to ensure compliance with the CBPL VREQ until 2 years after it came into force, nor did the Firm issue a formal documented framework for ensuring compliance with the CBPL VREQ until April 2023.*

(Emphasis added).

134.    In the Final Notice, the FCA stated that it "considers that CBPL's failings in relation to the controls ***that it put in place to comply with the CBPL VREQ were serious and persistent***." (Emphasis added). Further, the Final Notice stated that "[t]he failings ***significantly increased the***

*risk that financial crime might be facilitated by the Firm at a time when the Authority had*

*informed CBPL that its systems and controls were not fully effective and required remediation*."

(Emphasis added).

135.    On July 25, 2024, during market hours, *Reuters* published an article entitled

"Coinbase UK unit fined for breaching financial crime requirements." It stated the following:

> *A Coinbase business in Britain has been fined for breaching a regulatory agreement to improve its defences against financial crime, in the first sanction of its kind in the UK cryptoassets sector.*
>
> *The Financial Conduct Authority (FCA) said on Thursday that CB Payments Limited (CBPL), a gateway for customers to trade cryptoassets within the global Coinbase Group, voluntarily agreed in October 2020 to make improvements to its financial crime controls after a visit by the watchdog.*
>
> *The agreement stipulated that CBPL could not accept new high-risk customers until the issues were addressed. The company, however, took on or provided e-money services to 13,416 such customers with nearly a third depositing a total of $24.9 million, the FCA said.*
>
> *This money was used to execute multiple cryptoasset transactions via other Coinbase entities, totalling about $226 million, the watchdog said, adding that repeated breaches of the voluntary agreement went undiscovered for almost two years.*
>
> \*      \*      \*
>
> *CBPL will pay a 3.5 million pound ($4.5 million) fine after qualifying for a 30% discount by agreeing to resolve the case.*

(Emphasis added).

136.    On this news, the price of Coinbase's common stock fell by $13.52 per share, or

5.52%, to close at $231.52 on July 25, 2024.

137.    On May 5, 2025, it was reported by NBC News and other outlets that a hacker had

exploited a vulnerability in TeleMessage, an archiving and messaging platform that allows

organizations to capture and store mobile communications, and that Coinbase was among the

companies affected by this hack.  As a result of the hack, TeleMessage halted its operations.

Although a Coinbase spokesperson stated that no "sensitive" customer information was accessed "since Coinbase does not use this tool to share passwords, seed phrases, or other data needed to access accounts," they did not expressly state whether customer related information that Coinbase did not deem sensitive was accessed.

138.    On May 11, 2025, Coinbase submitted a Data Breach Notification to the Office of the Attorney General of Maine, which disclosed a data breach occurring on December 26, 2024, and having been discovered on May 11, 2025. Coinbase identified the nature of the breach as resulting from "insider wrongdoing," and the Notification also identifies a prior Coinbase breach notification on July 16, 2024.

139.    On May 14, 2025, Coinbase filed with the SEC a Form 8-K for the year ended December 31, 2022 (the "May 14, 2025 8-K"), which disclosed a "Material Cybersecurity Incident."

140.    The May 14, 2025 8-K Report contained the following statement:

> On May 11, 2025, Coinbase, Inc., a subsidiary of Coinbase Global, Inc. ("Coinbase" or the "Company"), received an email communication from **an unknown threat actor claiming to have obtained information about certain Coinbase customer accounts, as well as internal Coinbase documentation, including materials relating to customer-service and account-management systems**. The communication demanded money in exchange for not publicly disclosing the information. The threat actor appears to have obtained this information by paying multiple contractors or employees working in support roles outside the United States to collect information from internal Coinbase systems to which they had access in order to perform their job responsibilities. **These instances of such personnel accessing data without business need were independently detected by the Company's security monitoring in the previous months**.
>
> *        *        *
>
> Since receipt of the email, **the Company has assessed the email to be credible**, and has concluded that these prior instances of

> *improper data access were part of a single campaign (the "Incident") that succeeded in taking data from internal systems.*
>
> *    *    *
>
> *While the Company is still investigating the affected data, it included:*
>
> - *Name, address, phone, and email;*
> - *Masked Social Security (last 4 digits only);*

*(*Emphasis added).

141.    On May 15, 2025, Coinbase made a statement regarding the hack, including that cybercriminals had successfully bribed Coinbase customer service agents who reside outside the United States to hand over sensitive personal data on Coinbase customers, such as names, dates of birth and partial social security numbers.  And that the criminals have demanded $20 million in exchange for the return of the information, but that Coinbase has refused to pay the ransom.[1]

142.    On this news, the price of Coinbase's common stock fell by $19.85 per share, or 7.2%, to close at $244 on May 15, 2025.

143.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Coinbase securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers  and directors of the Company, members of the Individual Defendants' immediate families and

---

[1] *See* https://www.coinbase.com/blog/protecting-our-customers-standing-up-to-extortionists.

their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

145.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

146.    The Class is ascertainable because the class definition is sufficiently specific, and the members of the Class may be identified through business records, as the Company and transfer agents maintain records identifying all shareholders.

147.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

148.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class

Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

▪ whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

▪ whether Defendants acted knowingly or recklessly in issuing false filings;

▪ whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

▪ whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

151.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

• as a public issuer, the Company filed public reports;

• the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

152.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

153.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## <u>COUNT I</u>
### Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
Against All Defendants

154.    Plaintiff repeats and incorporates by reference paragraphs 1 through 153 as if fully set forth herein.

155.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

158.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

159.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

160.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

161.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

162.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

163.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

164.    Plaintiff repeats and incorporates by reference paragraphs 1 through 153 as if fully set forth herein.

165.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

166.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

167.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

168.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays that the Court enter a final judgment and relief against each Defendant as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues herein.

Respectfully submitted, this 22nd day of May, 2025.

47

*/s/ Eric Lechtzin*

Eric Lechtzin (PA ID # 62096)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com

*Local Counsel for Plaintiff*

**HERMAN JONES LLP**
John C. Herman*
  (Ga. Bar No. 348370)
Candace N. Smith*
  (Ga. Bar No. 654910)
Carlton R. Jones*
  (Ga. Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com
(*to be admitted *pro hac vice*)

*Counsel for Plaintiff*